AO 91 (Rev. 11/11) Criminal Complaint                                    AUSA Sunil R. Harjani (312) 353-9353

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
11-4-14
NOV — 4 2014
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

    v.

ROBERT VAUGHAN

CASE NUMBER:

**CRIMINAL COMPLAINT**

14 CR 639

MAGISTRATE JUDGE MARTIN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about January 2011 to in or about November 2014, at Chicago, and elsewhere, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1951 | Defendant knowingly conspired to commit robbery by obtaining property, namely marijuana, contraband cigarettes, and money, and thereby affected commerce. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

JEFFREY B. MOORE
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: November 4, 2014

City and state: Chicago, Illinois

_Judge's signature_

DANIEL G. MARTIN, U.S. Magistrate Judge
_Printed name and Title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jeffrey B. Moore, having been duly sworn, state as follow:

1.     I am a Special Agent with the Federal Bureau of Investigation and have been so employed for 11 years.  I am currently assigned to a squad focused on investigating public corruption in the Chicago area.  I have participated in investigations involving violations of federal criminal laws, including but not limited to extortion and robbery in violation of Title 18, United States Code, Section 1951.  I have also received special training in the enforcement of laws and methods of investigation, including but not limited to, investigative techniques, undercover operations, informant development and handling, physical and electronic surveillance, and debriefing defendants, witnesses, and informants.

2.     The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and in law enforcement records, information provided by a cooperating source, review of consensually-recorded conversations, and my training and experience, as well as the training and experience of other law enforcement agents

3.     This investigation included the use of consensually-recorded telephone calls and meetings.  The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations.  Furthermore, quoted material from the recorded conversations as set out in this affidavit are based on a preliminary review of the recorded conversations, not final transcripts of the recordings.  In addition, the summaries do not include reference to all statements made by the speakers on the topics described by the speakers.  In some of the paragraphs describing the recordings below, my interpretations of the discussion are included.  These interpretations include meanings attributed to code words, coded language, or vague references used by speakers.  My understanding and interpretation of the conversations are

1

based upon the contents of the conversations, information provided by the cooperating source, the context of both prior and subsequent recorded conversations, my knowledge of this investigation, my experience and training, and the experience and training of other law enforcement agents involved in this investigation.

4.     I submit this affidavit in support of a criminal complaint alleging that between in or about January 2011 through in or about November 2014, at Chicago, and elsewhere, in the Northern District of Illinois, Eastern Division, ROBERT VAUGHAN did knowingly conspire to commit robbery by obtaining property, namely marijuana, contraband cigarettes, and money, and thereby affected commerce, in violation of Title 18, United States Code, Section 1951. Since this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include each and every fact known to me concerning this investigation.

## SUMMARY

5.     As explained below, Officer A and VAUGHAN are police officers with the Cook County Sheriff's Office, Illinois, and also members of the High Intensity Drug Trafficking Area team (HIDTA), a joint federal, state, and local initiative to combat the trafficking of illegal narcotics. Between in or about January 2011 and in or about November 2014, Officer A and VAUGHAN, together with CS1, who was also a former police officer, conspired to and used their positions as police officers to rob individuals of marijuana, contraband cigarettes, and money, which they kept for their own personal benefit. At times, Officer A, VAUGHAN, and CS1 orchestrated controlled transactions, under the guise of law enforcement operations, with individuals engaged in either the trafficking of contraband cigarettes or marijuana. Officer A, VAUGHAN, and CS1 used their police powers to arrest the individuals involved immediately after the transactions, but then released them without charges, and kept some or all of the proceeds

2

of the controlled transactions (money, marijuana and/or contraband cigarettes) for their own personal benefit. At other times, Officer A, VAUGHAN, and CS1 robbed individuals or homes of marijuana based on information they learned from confidential informants they used in their roles as police officers. Officer A, VAUGHAN, and CS1 then sold the marijuana to various narcotics traffickers in Chicago in exchange for cash, which they retained for their own personal benefit.

6.      Between in or about September 2014 and in or about November 2014, CS1 consensually recorded his conversations with Officer A and VAUGHAN. During these recordings, Officer A, VAUGHAN, and CS1 discussed their plan to rob, using Officer A's and VAUGHAN's police powers, an individual who was transporting approximately one hundred pounds of marijuana from Texas to Chicago, Illinois. As discussed below, on November 3, 2014, Officer A and VAUGHAN were in the process of robbing this individual (an undercover law enforcement agent) of approximately seventy pounds of marijuana, when Officer A and VAUGHAN were arrested by law enforcement agents from the FBI.

**BACKGROUND**

7.      Based on information obtained from law enforcement personnel, Officer A and VAUGHAN are police officers with the Cook County Sheriff's Office, Illinois, and are currently assigned to HIDTA to assist in the investigation of illegal narcotics trafficking in the Chicago area.

8.      Until approximately September 2013, CS1 was a police officer with the Village of Lyons Police Department and a Task Force Officer with the U.S. Food and Drug Administration. On or about August 4, 2014, CS1 was convicted in the Northern District of Illinois for extortion under color of official right, in violation of Title 18, United States Code, Section 1951, for using his police powers to extort contraband cigarette traffickers of their cigarettes and cash. CS1 was

3

sentenced to five years' imprisonment, but remains released on bond until he is scheduled to report

to the Bureau of Prisons to serve his sentence. Since his sentencing hearing, CS1 has cooperated

with law enforcement agents in a covert capacity, has provided information about Officer A and

VAUGHAN, and as discussed below, consensually recorded his conversations with Officer A and

VAUGHAN.[1]

9.     CS2 is a confidential informant that CS1 used to set up contraband cigarette

transactions.[2]  At the direction of the FBI, CS2 consensually recorded his conversations with CS1

about CS1's extortion and robbery activities from in or about July 2013 through in or about

September 2013, which evidence subsequently led to CS1's prosecution for extortion under color

of official right, as described in paragraph 8.

10.    Illinois law, along with county and city ordinances, regulate the distribution of

cigarettes.  Distributors or wholesalers of cigarettes must apply for and receive a license from the

Illinois Department of Revenue pursuant to Illinois law.  These distributors must also purchase

---

[1]     CS1 is cooperating in the hope that the government will recommend a reduction of his sentence pursuant to Federal Rule of Criminal Procedure 35.  The government has not reached any agreement with defendant as to any reduction of his sentence.  The government has provided defendant a non-target letter that states that he is currently not the target of any investigation based on the evidence in the government's possession as of the date of that letter.  I believe that CS1 has provided reliable information based on the fact that a substantial portion of CS1's information has been corroborated by independent investigation, including physical surveillance and consensually recorded calls and in-person meetings.

[2]     CS2 first began cooperating with the FBI in 2005 after having been indicted for fraud. CS2 has since pled guilty to that crime and has a plea agreement which provides that the government anticipates recommending a reduced sentence in exchange for CS2's full and truthful cooperation. To date, CS2 has assisted law enforcement in a number of investigations, and has testified for the government in two different trials.  CS2 has been paid for his services and expenses for his participation in a variety of investigations.  In total, from approximately 2006 to approximately 2013, CS2 has been paid in excess of $280,000 for his cooperation with multiple federal law enforcement agencies in undercover investigations. I believe that CS2 has provided timely and reliable information concerning the illegal activities identified in this affidavit.  My belief is based on the fact that a substantial portion of CS2's information has been corroborated by independent investigation, including physical surveillance and consensually recorded telephone calls and in-person meetings.

4

tax stamps from the State of Illinois and affix those stamps to the cigarette packs before sale to retail outlets. The Illinois Cigarette Tax Act requires taxes to be paid on each pack of cigarettes which must be evidenced by revenue tax stamps affixed to each pack of cigarettes. 35 ILCS §§130/3, 135/3. In addition, licensed distributors who sell cigarettes in Cook County must also purchase and affix tax stamps to cigarette packs that they sell. Cook County, Code of Ordinance, Chpt. 74, Art. XI, Sec. 74-433, 74-435. The tax stamps are affixed to the side or the bottom of each cigarette pack as evidence that the applicable state and county taxes have been paid in full. Cigarettes packs that bear no evidence of tax stamps or do not have the appropriate and necessary stamps (such as stamps from different states) are commonly called contraband cigarettes. Pursuant to Title 18, United States Code, Section 2342(a), it is a violation of federal law to knowingly possess, receive, transport or distribute more than 10,000 contraband cigarettes, unless certain exceptions are met that are detailed in Section 2341(2)(C). Moreover, the Illinois Cigarette Tax Act makes it a crime to possess and distribute contraband cigarettes by unlicensed distributors. 35 ILCS §130/24.

11.   Title 21, United States Code, Section 841(a)(1), makes it a federal crime to, among other things, distribute, or possess with the intent to distribute a controlled substance, including marijuana, a Schedule I controlled substance.

## FACTS SUPPORTING PROBABLE CAUSE

### *Overview*

12.   According to CS1, he, Officer A, and VAUGHAN have engaged in robbing individuals of marijuana, contraband cigarettes, and cash using their police powers since approximately 2011. According to CS1, he and Officer A engaged in at least four contraband cigarette robberies together, and he, Officer A, and VAUGHAN participated in the robbery of a

5

contraband cigarette trafficker on or about July 30, 2013. Specifically, according to CS1, he and Officer A used confidential informants to set up transactions whereby informants sold contraband cigarettes (supplied by CS1 and Officer A) to individuals in exchange for money. According to CS1, after the completion of the transactions, he and Officer A detained the individuals purchasing the contraband cigarettes and seized the cigarettes, but then released the individuals. On these same occasions, CS1 and Officer A kept a substantial portion of the money from the transactions for themselves, paid the informants a fee for participating in the transactions, and did not turn in any of the funds involved in the transactions to their respective police stations. According to CS1, he, Officer A, and VAUGHAN, carried out this same scheme on or about July 30, 2013, as further described below. In total, according to CS1, he and Officer A together have received in excess of $30,000 from these cigarette robberies, with VAUGHAN receiving approximately $500 and a gun from the July 30, 2013 transaction.

13. According to CS1, he, Officer A, and VAUGHAN have engaged in at least six robberies of individuals or homes where they have stolen substantial quantities of marijuana between in or about 2011 and in or about 2013. According to CS1, he, Officer A, and VAUGHAN used confidential informants developed through their police work to set up transactions, in each of which a narcotics dealer believed that he was meeting a customer who was interested in purchasing marijuana at a certain location. However, according to CS1, on these occasions, he, Officer A, and VAUGHAN arrived at the meeting location, handcuffed the dealer, confiscated the marijuana, but let then released the dealer without any charges. At other times, according to CS1, he, Officer A, and VAUGHAN conducted a traffic stop of an individual who they believed to be transporting marijuana, and confiscated the marijuana without charging the individual. In addition, according to CS1, on at least one occasion, he, Officer A, and

6

VAUGHAN stole marijuana from a home after receiving information from an informant about a drug "stash" house. According to CS1, after conducting the above described robberies, he, Officer A, and VAUGHAN used narcotics traffickers they knew to sell the marijuana in exchange for cash, which cash they kept for their own personal benefit. According to CS1, he, Officer A, and VAUGHAN have received a total of in excess of $100,000 from the sale of stolen marijuana.

14.     Details about one particular transaction, the July 30, 2013 robbery of Individual E of contraband cigarettes and money, is further discussed below. Besides information obtained from CS1 about this transaction, the FBI has also obtained corroborating evidence from CS2's consensual recordings of his conversation with CS1 that were made before, during, and after the transaction, the FBI's surveillance of this transaction, interviews of witnesses, and review of documents obtained from the Village of Lyons Police Department.

15.     In addition, as further described below, between September 2014 and November 2014, CS1 has consensually recorded his meetings and conversations with Officer A and VAUGHAN. During those recordings, Officer A and VAUGHAN discussed their prior robberies of marijuana and contraband cigarette traffickers, and discussed plans for a new marijuana robbery that was planned for November 3, 2014.

### *Contraband Cigarette Robbery on July 30, 2013*

16.     According to CS1, he, Officer A, and VAUGHAN robbed Individual E of contraband cigarettes and money on July 30, 2013. According to CS1, he used CS2 to set up a contraband cigarette transaction with Individual E, an owner of a convenience store located in Chicago, Illinois. In order to facilitate the transaction, CS1 obtained approximately 330 cartons

7

of contraband Newport-brand cigarettes to use in this transaction.[3]

17.     According to CS1, on July 30, 2013, CS1 met with CS2 in a parking lot in Chicago, Illinois. CS1 was wearing body armor marked "Police" and a tactical belt equipped with a handgun, handcuffs, and ammunition magazines. According to CS1, he loaded CS2's vehicle with 330 cartons of contraband Newport-brand cigarettes for him to use in the purported sale of these cigarettes to Individual E.[4]

18.     According to CS1, after this meeting, CS2 drove to meet with Individual E at his store in Chicago, Illinois. According to CS1, Individual E came outside the store to meet with CS2 in the alley. CS2 then provided Individual E approximately 300 cartons of the contraband cigarettes in exchange for $11,280, which CS2 retained. According to CS1, as CS2 drove away, CS1, Officer A, and VAUGHAN arrived in two vehicles with police lights flashing. CS1, Officer A, and VAUGHAN placed Individual E in handcuffs. CS1, Officer A, and VAUGHAN loaded boxes of the contraband cigarettes that had just been delivered by CS2 to Individual E into their police van. According to CS1, he also went inside the store and talked to Individual E. According to CS1, he told Individual E that he would keep the cigarettes. CS1 said that he was going to release Individual E. According to CS1, he told Individual E not to complain about the incident and that the police were monitoring his phone. According to CS1, he did not provide a receipt for the seizure to Individual E. According to CS1, VAUGHAN stole a firearm from Individual E's store, which VAUGHAN kept for his own personal benefit. According to CS1,

_____

3      According to the website of Lorillard, Inc., the maker of Newport cigarettes, Lorillard manufactures all of its cigarettes in North Carolina. Thus, Newport cigarettes are not manufactured in Illinois and are brought in from out-of-state.

4      Prior to CS1's arrest, prosecution, and subsequent cooperation, CS2 consensually recorded his meetings and conversations with CS1. These recordings corroborate much of the information provided by CS1 about the July 30, 2013 transaction.

CS1 also stole two bottles of liquor from the store.

19.     According to CS1, after CS1 left the store, he met with CS2.   CS1 collected from CS2 the $11,280 that was provided by Individual E and returned $3,280 to CS2 as payment to CS2. CS1 also gave CS2 a bottle of Patron tequila that he had stolen from Individual E's store and 30 cartons of contraband cigarettes.   According to CS1, he retained the remaining $8,000 and did not turn any funds into the Lyons Police Department.   He also retained the remaining 270 cartons of cigarettes that he seized from Individual E.   According to CS1, he gave approximately $3,750 to Officer A and approximately $500 to VAUGHAN from the $8,000 that he obtained from Individual E.

20.     According to CS1, he prepared a report for the July 30, 2013 transaction with Individual E and filed it with the Lyons Police Department.   In the report, according to CS1, he falsely stated that he confiscated only cigarettes from Individual E.   According to CS1, he concealed the fact that he obtained $11,280 provided by Individual E for the cigarettes, paid CS2 $3,280, and divided the remaining funds between himself, Officer A and VAUGHAN. According to CS1, he did not turn in any funds to Lyons Police Department in accordance with department procedures for the seizure of funds.

21.     FBI agents conducted surveillance of the July 30, 2013 transaction and saw CS1, Officer A, and VAUGHAN arrive at Individual E's store with police vehicles.   FBI agents observed CS1, Officer A, and VAUGHAN wearing their tactical vests with police markings.   FBI agents also observed that Individual E and another individual were placed in handcuffs.   FBI agents also observed CS1, Officer A, and VAUGHAN moving into their police vehicles boxes that were similar to the boxes of contraband cigarettes that CS2 had just sold to Individual E.   I have also reviewed a security videotape made from a camera inside Individual E's store from the date of

9

the transaction. On the security videotape, I saw CS1 inside the store on the recording.

22.     I have obtained and reviewed the report for the transaction on July 30, 2013 submitted by CS1 to the Lyons Police Department. In the report, CS1 described this transaction and stated that he confiscated cigarettes only. CS1 also stated that Cook County Sheriff's Police Officers assisted him during the incident. There is no discussion of any cash seized. According to Lyons Police Department, there is also no record at Lyons Police Department of CS1 turning in $8,000 from the July 30, 2013 transaction or contraband cigarettes, and CS1 did not document that he allowed CS2 to keep $3,280 from this transaction. FBI agents also interviewed CS1's direct supervisor on or about August 28, 2013, who did not have knowledge of any controlled contraband cigarette transaction on or about July 30, 2013. I have also confirmed from the Lyons Police Department that Individual E was not charged as a result of his purchase of contraband cigarettes on July 30, 2013.[5]

### Consensually Recorded Conversations with Officer A on September 16, 2014

23.     At the direction of the FBI, CS1 met with Officer A and consensually recorded his conversation on September 16, 2014.[6] This meeting was recorded with audio and video. During the recorded meeting, CS1 told Officer A that the only reason he had not "rat" on Officer A and VAUGHAN was because Officer A had paid him some money after CS1's arrest. (According to

---

5     I have been to Individual E's convenience store and saw that it sold, among other things, packaged goods, drinks and miscellaneous items like phone cards and candy, at least some of which I believe was transported into Illinois from out-of-state.

6     Besides information provided by CS1 about Officer A's presence at recorded meetings described in this affidavit, I have confirmed that Officer A was a participant in this conversation because the September 16, 2014 meeting was consensually recorded with both audio and video, and Officer A is seen on the video talking to CS1. Certain recordings after the September 16, 2014 meeting are only audio recorded, but I am familiar with Officer A's voice from watching the recordings that contain video images of Officer A speaking, and I recognize his voice on all recordings described in this affidavit where Officer A is identified as the speaker.

CS1, Officer A had provided him approximately $4,000 after his arrest.) During this recording, CS1 suggested that Officer A recover some of that money from VAUGHAN. Officer A stated, "I can't make him [VAUGHAN] fucking pay." CS1 stated that Officer A's payment of money to CS1 had led CS1 not to cooperate with law enforcement, and resulted in Officer A and VAUGHAN not being prosecuted. Officer A responded, "Yeah."

24. According to CS1, he had previously discussed an opportunity to commit another marijuana robbery with Officer A in a prior, unrecorded conversation. During this recorded meeting on September 16, 2014, CS1 discussed again the potential marijuana robbery. CS1 explained that the robbery would be on an individual that would be driving a shipment of marijuana from Texas to Chicago, Illinois. CS1 stated the information about the driver and the transport would be provided by his contact, Individual A.[7] Officer A agreed to participate. Officer A further stated, "If there is something that comes through . . . and we ship it off to fuckin' uh, [Individual B] and he moves it, if we're gonna split it four ways . . . it shouldn't be a problem." That is, Officer A stated that if the deal was successful and Individual B, a narcotics trafficker he knew, sold the marijuana, the money would be split between Officer A, VAUGHAN, CS1, and Individual A, who was providing the information about the transport of the marijuana. Referring to VAUGHAN, Officer A stated, "When we talked about it before, when you told me, he [VAUGHAN] was on board on it." In other words, Officer A had already discussed the robbery with VAUGHAN and, according to Officer A, VAUGHAN had agreed to participate.

25. Officer A further stated, "Yeah, I'll run it past Bobby [VAUGHAN], it wouldn't be a problem for him or me. Its just, who's going to drive the shit over here . . . the weed?" CS1

---

[7] On the recordings, CS1 portrayed Individual A as a person who had information about a marijuana shipment and was facilitating the transport of marijuana from Texas to Chicago, Illinois, but that he was not the owner of the marijuana.

stated that Individual A would provide the information about the driver. Officer A stated, "If we can make this all right, and shit like that, we're kind of playing among friends, before . . . same scenario . . . we just have to figure out how to play it off . . . probably there is little more suspicion on me and Bobby . . . but that is no big deal." That is, Officer A stated that he would participate in the robbery and that it involved the same scenario as prior robberies that they had previously done, but that Officer A wanted to be careful about how the transaction played out so it would not appear to be a robbery.

26.     Referring to the contraband cigarette transaction with Individual E on July 30, 2013, CS1 asked about the gun VAUGHAN stole from Individual E's store. Officer A stated he didn't know what VAUGHAN did with the "fuckin' Arabic's [Individual E] gun." Officer A also stated that VAUGHAN was "still used to the money coming in," but "it all stopped when . . . you got in trouble." That is, Officer A stated that he and VAUGHAN had not done a robbery since CS1 got arrested. Officer A also stated, "This off the radar type of stuff, that's hard to catch . . . unfortunately the fucking Arab [CS2] was different." In other words, Officer A stated that their robberies of marijuana and contraband cigarette traffickers were difficult for law enforcement to detect, but CS2's recordings was the reason why CS1 got caught and prosecuted. Referring to the marijuana that they intended to steal, Officer A stated, "As long as we have what's his name on board . . . [Individual B] . . . we'll be okay."

27.     CS1 also asked if Officer A had told his wife that CS1 had given him some money from the July 30, 2013 transaction. Officer A stated, "No."

### Consensually Recorded Conversation with Officer A on September 30, 2014

28.     On September 30, 2014, CS1 consensually recorded a meeting with Officer A. This meeting was recorded with audio only. Discussing the potential marijuana robbery, CS1

stated Individual A had information about fifty to one hundred pounds of marijuana that was being planned to be sent to Chicago, and that Individual A had a contact to sell it in Chicago. Officer A stated, "I don't know if I trust them. I kind of like the Polack . . . he always paid up, up to the penny." That is, Officer A stated he preferred to have Individual B (the "Polack"), the source that they had used before in prior robberies, to sell the marijuana for them. Officer A further stated, "I don't know if I trust another guy . . . getting rid of the shit [.] That's the shit that can get you. . . . The Pollack has been tested and he always came through." Officer A further stated, "I wouldn't put a hundred pounds on a new guy."

29. Referring to splitting the funds after the sale of the marijuana, Officer A stated, "If Bobby [VAUGHAN] is involved, we have to split . . . 25, 25, 25 . . ." That is, Officer A stated the funds should be split four-ways between Officer A, VAUGHAN, CS1, and Individual A. CS1 and Officer A also discussed the execution of the robbery and that a driver would bring the marijuana to Chicago. Officer A stated if the driver had a "hundred pounds, and we put 10 pounds in evidence, or 5 pounds, and cut him loose." That is, Officer A stated he wanted to arrest the driver of the vehicle, but only log into evidence at a police station five or ten pounds out of one hundred pounds of marijuana, and then release the driver from custody. Officer A further stated, "I think if it's a third person . . . he's going to be on the hook to that guy for that money, for the 100 pounds." Officer A also stated, "If we do a straight up rip, he's going to come back to the guy . . . and Individual A is going to be on the hook." In other words, Officer A expressed his fear that Individual A would be responsible to the owner of the marijuana. Officer A stated that someone would get "suspicious." Officer A further stated, "100 pounds of weed, you know, somebody is gonna to have to answer up at some point." Officer A also said, "A hundred pounds, it's a big bag, a big duffle bag. A big duffle bag of fucking weed. Remember when it was 60 pounds, it

was two fucking suitcases."

30.    CS1 asked if VAUGHAN was on board with the planned robbery, and Officer A responded, "Yeah, he'll be on board." Officer A stated he had talked to VAUGHAN about the robbery, but had not yet provided any details. Referring to the planned robbery, "This last thing . . . I'm gonna profit off it . . . but I know it is something you will be able to stash away too." That is, Officer A stated that he would make money off the robbery, but it was an opportunity for CS1 to make some money as well. Officer A further stated, "I don't want this to go somewhere wrong."

31.    Referring to the planned robbery, CS1 stated, "I will sit with the vest on as a ride along." Officer A stated, "Sit in the back seat, no one will see you anyway." Officer A also stated that the robbery "has to be during work hours." Officer A further stated he had a new supervisor, and "he might raise his eyebrows, say 'Well, why you are doing this on Saturday?'"

32.    Officer A again raised the issue of arresting the driver, but reporting only a small seizure of marijuana. Officer A stated that if they didn't know the driver of the vehicle, "we might have to put a couple of fucking bags in evidence or something." Officer A stated he would report that they stopped a guy with "two pounds of weed" and "bring him to the square" in order to "play it out somehow." In other words, Officer A stated that, during the robbery, he wanted to arrest the driver but only report a small amount of seized marijuana and take the driver to the police station. Officer A further stated that later he would, "cut him loose," which I understood to mean Officer A would release the arrested individual without further charges. Officer A also stated, "We can break it down, once we figure out what it is, I can bring ziplock bags and take a pound, and fucking break it down and make ten bags of quarter pound." In other words, Officer A stated that he would transfer a small amount of the marijuana into ziplock bags that he would bring, and report to his police station that the driver only had a small amount of marijuana on him.

14

33.     During the recorded meeting, Officer A and CS1 discussed the contraband cigarette robberies and CS1's indictment.   Officer A stated that an FBI agent had told him he was going to be reported to "internal affairs," which I understand to mean Officer A's police department's internal affairs division.   CS1 and Officer A also talked about the day FBI agents approached them to discuss the July 30, 2013 transaction.   CS1 stated that he was glad he was able to contact Officer A before FBI had approached him to let him know they were coming.   Officer A agreed, and further stated "I know you didn't talk to them [FBI]."[8]   Officer A also stated that his "stomach was churning for a fucking year" after CS1's arrest.

34.     Discussing the contraband cigarette robberies, Officer A also stated, "The way they spelled it out on the indictment . . . how much money did they say.   Bobby thinks you pocket all that money.   The 50."   In other words, Officer A stated that VAUGHAN believed CS1 kept more money than Officer A and VAUGHAN obtained from the contraband cigarette robberies because CS1's criminal case filings identified the robberies resulted in $50,000 in proceeds.   Officer A stated, "I think our split was eleven grand," meaning that Officer A believed they each received $11,000 from the contraband cigarette robberies.   Referring to the July 30, 2013 transaction, CS1 asked what VAUGHAN thought Officer A had gotten for the robbery.   Officer A stated, "500."

35.     CS1 asked Officer A about an incident in which Individual A had been questioned by law enforcement in the past.   Regarding the timeframe of that incident, CS1 asked, "I think when he [Individual A] called us, we weren't scamming, were we?"   Officer A responded, "We were in it then," referring to the fact that CS1 and Officer A were engaging in robberies at that

---

8 In or about August 2013, FBI agents approached CS1 for an interview, and he declined to speak to agents.   That day, FBI agents also approached Officer A for an interview, and, in summary, he stated that he was unaware that CS1 was keeping the proceeds of the contraband cigarette transactions and denied receiving any of the proceeds.   According to CS1, he was able to contact Officer A immediately after being approached by agents, and warn him that the FBI may approach him soon.

time.

36.     CS1 said, "If this scam works out, you don't owe me . . . you don't have to give me any more money."   Referring to CS1's arrest and prosecution for contraband cigarette robberies, Officer A stated, "I really feel bad. . . I helped you because . . . there was a lot of money that came in[.] I wish I had more to give you.   You, ultimately, you know, got fucked."   Referring to using CS2 for the contraband cigarette robberies, CS1 said, "You had reservations . . . about the Arab [CS2]."   Officer A responded, "Right."   Officer A also stated, "I am going to go the extra mile to help you."

### October 7, 2014 Consensual Recording with Officer A

37.     On October 7, 2014, CS1 consensually recorded a meeting with Officer A.   This meeting was recorded with both audio and video.   During the meeting, CS1 asked Officer A about VAUGHAN, who was supposed to attend the meeting.   Officer A stated, "Bobby [VAUGHAN] he is okay….he didn't want to come to the house, but he can meet up somewhere."   Regarding the planned robbery, Officer A further stated referring to VAUGHAN, "I talked to him yesterday…..he's on board."

38.     Regarding the use of pre-paid cellular telephones, Officer A stated, "I think I'm going to reactivate my drop phone, remember like the ones we had before," referring to their prior use of pre-paid cellular telephones.   Officer A stated, "If we gotta do something, I'll just talk on my drop phone."   Officer A further stated, "The work phone…the phones didn't get us in trouble the last time, but you know," referring to the fact that law enforcement did not use telephonic communications as evidence against them during the investigation.

39.     CS1 and Officer A discussed how the marijuana would be delivered to Chicago. Officer A stated, "Let's say it's here already, because how it gets here is not our

problem." Officer A and CS1 also discussed various methods to conceal from the driver that they were conducting a robbery. Officer A suggested, "If Individual A could fucking rent a car in his name, it would be even better." Officer A stated he would tell the driver, "Driver get the fuck out of here," if the car was not in the driver's name, indicating he would let the driver go without being charged. However, in discussing the fifty to one hundred pounds of marijuana they planned to rob, Officer A stated, "If it's that much...you gotta bring him [the driver] to the station." Officer A stated, "Bringing him to the station is no big deal...makes it more legit." Officer A stated, "If we go to the station we probably gotta put a couple of bags in," meaning they would place only a small portion of the marijuana in evidence. Officer A expressed concern about not bringing the driver to the police station, stating, "If you rip him for 50 pounds on the fucking street and don't bring him anywhere. . . ".

40.     CS1 and Officer A also discussed who they would use to sell the marijuana after the planned robbery. CS1 stated, "That's another reason why I wanted to talk to Bobby [VAUGHAN], because he talks to [Individual B]....can he [Individual B] handle that, is he willing to handle that," which referred to selling up to one hundred pounds of marijuana. Officer A stated, "Bobby [VAUGHAN] already talked to him about the 50. He said it should be no problem with the 50." I understand "50" to be referring to fifty pounds of marijuana. Officer A stated, "He's [Individual B] just slow... it's gonna be the same...five, six every week....he's not going to move fast for nothing," referring to the pace at which Individual B would sell the marijuana.

41.     Concerned about receiving his share of the money from VAUGHAN after the robbery, CS1 stated, "As long as I don't get ripped." Officer A responded, "That's not even an issue." Officer A stated, "Before we set this up, we'll have an agreement," concerning how the money would be handled. Officer A also stated, "Let's say hypothetically its 100, so everybody

17

taking 25," which meant each would receive 25% the proceeds from the sale of one hundred pounds of marijuana. CS1 asked what was the lowest price Individual B ever provided. Officer A stated, "Either 25 or 27", meaning $2,500 or $2,700 per pound. CS1 stated, "Let's go 25....that's $250,000, divided by four, would be 62 a piece," which referred to $62,000 per person.

42.     Referring to the FBI's investigation on Officer A and VAUGHAN for contraband cigarette trafficking, Officer A stated, "They got a guy [CS1] who admitted to whatever happened, and that's it, and no one else is talking or pointing fingers, all these people can say whatever they want, they [FBI] can't corroborate it." That is, Officer A stated that CS1 admitted to the cigarette robberies, but was not cooperating with law enforcement, and there were no other witnesses about Officer A's and VAUGHAN's involvement in contraband cigarette robberies. In discussing the chances of getting caught for the planned marijuana robbery, Officer A stated, "If you don't have fucking somebody doing you, it's so hard to get caught in it." That is, Officer A stated that it was difficult for law enforcement to detect the robberies unless a cooperator was involved in the robbery.

### October 15, 2014 Consensual Recording with Officer A and VAUGHAN

43.     On October 15, 2014, CS1 consensually recorded a meeting with Officer A and VAUGHAN.[9] This meeting was recorded with audio only. CS1 asked VAUGHAN, "Do you know the whole background with this?" referring to the planned robbery CS1 previously discussed

---

[9]     CS1 identified VAUGHAN and his voice during the meetings on October 15, 23, and 28, 2014. In addition, during the recordings, I heard CS1 and Officer A refer to the third individual present as "Bobby," which I understand from my investigation refers to ROBERT VAUGHAN. In these recordings, VAUGHAN also refers to his police work for the Cook County Sheriff's Office. An FBI agent has identified VAUGHAN's police vehicle by observing his vehicle parked outside VAUGHAN's house. During this meeting, and the subsequent meeting on October 23, 2014, at which VAUGHAN was present, I observed VAUGHAN's police vehicle present at these meetings.

with Officer A. VAUGHAN responded, "a little bit." CS1 stated Individual A "was looking for a Chicago connect to dump it," referring to marijuana sent from Individual A's contact in Texas. Regarding the quantity of marijuana expected to be received from Texas, CS1 stated, "Guaranteed 50 and up to 100 [pounds]." CS1 stated he understood, based on conversations with Officer A, that Officer A and VAUGHAN couldn't work on the weekend because of their new boss.

VAUGHAN stated, "We can do it on the weekend." Officer A responded, "How are we going to get past [Officer A's Supervisor]?" VAUGHAN stated, "All we need was an excuse to be out," and suggested that they use surveillance as an excuse. VAUGHAN stated, "Nights, weekends, we can do whatever we want," referring to when they could conduct the planned robbery.

44.     CS1 stated Individual A had a guy that could "dump it fast," referring to the marijuana they planned to obtain from the robbery. Officer A stated, "I rather not do it with anybody . . .because that fucker you know, the people we have, they've been proven slow but reliable." Officer A further stated, "Then you are not dealing with anybody new......for the dumping part."

45.     During the recording, VAUGHAN asked CS1, "Does he know where it is up here?" meaning did Individual A know where marijuana was located in the Chicago area. CS1 responded, "No, its in Texas." CS1 asked both Officer A and VAUGHAN, "What do you think?" regarding plans for the robbery. Officer A stated, "I think it would be better during a weekday." VAUGHAN stated, "Don't limit yourself, whatever you gotta do, whatever you can do," suggesting they conduct the robbery on the weekend if necessary.

46.     CS1 stated, "I don't think getting it here is an issue. The issue is gonna be if it's going to be 50 or 100...and how is it going to land in our car?" CS1, Officer A and VAUGHAN

19

also discussed whether it was necessary to "deconflict" the driver, which meant whether they should check a law enforcement database as to whether any agency was investigating the driver. Officer A stated, "The best way to approach it right now, is don't do a paper trail until you actually do the thing, and see how it goes. And then if you need to do a paper trail you do one." That is, Officer A stated that running a deconfliction check on the driver would leave a record that they had researched him, and that they shouldn't do it unless it was necessary. Regarding the status of the robbery, VAUGHAN stated, "What's the hang up? Just because he's [Individual A] not here." CS1 stated, "I didn't give him any green light because we don't have anything set up." VAUGHAN responded, "Give him the green light."

47. CS1 stated Individual A would communicate with CS1 regarding who and where to meet for the marijuana delivery. Officer A stated, "Honestly, I still think the best way to fucking do this, is if Individual A can rent the fucking car in his name and have this guy use that car." Officer A stated the rental agreement "would kind of give him [the driver] a window of escape….because he's not going to be so suspicious if we fucking take a 100 pounds off of him and he just gets a kick in the ass." In other words, Officer A suggested that they had a false reason to release the driver of the car because they could represent they were more interested in pursuing Individual A, the renter of the car.

48. VAUGHAN told CS1 to ask Individual A, "Ask him what he gets for it, what he has to pay for it." VAUGHAN stated, "A long term connection, a good connection, might be worth more than just a fucking quick rip." That is, VAUGHAN stated that obtaining and selling marijuana by working with the driver and the ultimate supplier of the marijuana may be more profitable than stealing it. VAUGHAN further stated, "Then you got a steady income coming…we can get rid of it when it gets here." VAUGHAN stated, "We got three, four different guys that can

get rid of it for us." CS1 asked, "Who do you got to get rid of it besides [Individual B]?" VAUGHAN stated, "The boyfriend of [his wife's] cousin, that's all he does is weed." However, Officer A stated, "Long term shit fucking ends up in trouble." In other words, Officer A explained that there was a higher risk of getting caught by engaging in long-term narcotics trafficking. VAUGHAN stated, "What's a quick hit going to get you, 50 grand....if you did a long term thing it could be every week 5, 10 grand a week." That is, VAUGHAN noted that a one-time theft would result in $50,000 each, but long-term narcotics dealing would bring in $5,000 to $10,000 per week over a period of time.

49.    VAUGHAN told CS1, "Whatever you want to do man we're good," regarding the long term deal or stealing the marijuana. All three discussed how the money from the robbery would be split at $3,000 per pound, and Officer A stated, "300 grand...divided by 4, that about 75 a piece." That is, Officer A estimated they would each receive $75,000 from the robbery. VAUGHAN further stated, regarding previous robberies, "The first one we did, we should have gave it to him [another narcotics distributor]....but he offered us a lower number [price] for all of it." CS1 asked, "You don't anticipate a problem getting rid of it, do you Bobby [VAUGHAN]?" VAUGHAN responded, "Fuck no!" Officer A also objected to involving distributors other than Individual B. In response, referring to another narcotics distributor, VAUGHAN stated, "He didn't give you up, he ain't never say nothing about nothing."

50.    CS1 asked, "So what do you guys think?" Referring to the robbery, Officer A stated, "I think, definitely, put the wheel in motion for that." VAUGHAN stated, "Whatever you guys want to do is fine." Officer A, VAUGHAN and CS1 also discussed whether the victim of the robbery should be taken to the police station. Officer A stated, "If guy is a tough head....then he might have to go in and a couple of them [pounds of marijuana] might have to end up in

21

inventory." VAUGHAN responded, "That ain't no big deal, who cares?"

### October 23, 2014 Consensual Recording with Officer A and VAUGHAN

51.     On October 23, 2014, CS1 consensually recorded a meeting with Officer A and VAUGHAN. This meeting was recorded with audio only. During the recorded meeting, CS1 stated he got a "burner" cellular telephone, and provided the telephone number to Officer A and VAUGHAN. That is, CS1 stated that he had a cell phone that could be used specifically for talking to Officer A and VAUGHAN. During the meeting, VAUGHAN provided Officer A a "burner" cellular telephone he had in his possession and stated that he had one for himself. During the recording, Officer A called CS1's cell phone to provide CS1 the number to his "burner" cell phone.

52.     In discussing the planned robbery of marijuana, CS1 stated Individual A would rent a car in his name for the driver, which would be done a few days before the driver leaves from Texas. Officer A stated they could tell the driver, "The car is not in your name you got lucky motherfucker....we are going to go after the guy that the car's name is under." CS1 stated, "Just cut him," referring to letting the driver go. Officer A responded, "Just cut him, yeah." Officer A stated his main concern was that CS1 would not be able to talk to Individual A when CS1 reported to prison. Officer A stated Individual A may say it was two "coppers" who were CS1's friends, and "the next thing you know," the seller of the marijuana would say "I'm going to fucking call the feds."

53.     CS1 stated he told Individual A he needed the marijuana no later than November 3, 2014, the day before CS1 was scheduled to report to prison. Officer A asked if, "they are going to drive from Texas all the way up here with one hundred pounds." CS1 responded, "I assume."

54.     VAUGHAN asked CS1, "He's [Individual A] going to rent the car and give it [to]

them?" CS1 stated the rental car would be in Individual A's name and he would make sure there's paperwork in the glove box. VAUGHAN asked, "Does he have an IPhone…. Tell him to get an IPhone." VAUGHAN stated if the driver plugged the IPhone into the car "it's like a tracker." VAUGHAN stated they could pull the car over when it came into Cook County. CS1 stated he would ask Individual A, but wondered if the phone would cause suspicion. VAUGHAN stated, "It's not out of the ordinary if you were to give somebody a phone in charge of $300,000 of fucking shit." I understand that VAUGHAN was referring to the value of 100 pounds of marijuana as $300,000.

55.     CS1 stated if they stole the marijuana, the rental car would be here in Illinois with Individual A's name on it. CS1 asked if they would let the driver take the car back. Officer A stated, "Yeah, we're going to let him take it back." Officer A stated, "If it's going to be this much, a hundred, we'll probably take him to Markham…take the car, inventory fucking you know, I wouldn't do more than a pound." That is, Officer A stated that he wanted to arrest the driver and take him to a police station in Markham, but only log into evidence one pound of marijuana. VAUGHAN stated, "Put a hundred little baggies of this in there…..it's not even a pound." That is, VAUGHAN suggested breaking up one pound of marijuana into individual portions in ziplock bags.

56.     CS1 questioned whether they should take the driver to a police station, because the driver would know where to start "phone calling." Officer A stated "If you rip a hundred on the street without nothing, people get suspicious, dirty cops." Referring to providing CS1 his share of the proceeds, VAUGHAN stated, "We're going to need is your address and your wife's phone number, something to get a hold of her, to get those things to her." In other words, VAUGHAN asked for CS1's wife's contact information so that he could provide CS1's share of the money

from the eventual sale of marijuana to her because CS1 would be in prison serving his sentence.

57.     CS1 asked if he should take a separate vehicle the day of the robbery. Both VAUGHAN and Officer A responded, "Yeah." Officer A stated, "Separate vehicle for sure, I can't see it being too hard." CS1 stated the driver would be expecting to meet Individual A, so they would have a location and description of the car.

58.     During the recorded meeting, Officer A also proposed another means by which to steal the marijuana. Officer A asked CS1 to obtain from Individual A an extra set of keys to the rental vehicle, and have it sent to them by Federal Express. Officer A stated, "Tell the dude hey, just go fucking park the car go inside Dunkin Donuts and wait. And we'll fucking go in, take the car, and boom drive off." CS1 asked whose house Individual A would send the keys to. VAUGHAN stated, "Have him send them to a P.O. Box." Officer A stated, "That's even better… we'll get a P.O. Box." Officer A stated they would tell the driver to park at a location, and when he went inside, "they would fucking drive off with the fucking car." VAUGHAN stated, "That's the best idea I ever heard." CS1 stated he would ask Individual A about the idea. Officer A stated, "Once he has the car and the weed, either you stop him, or you have him go somewhere…..the only thing that could happen…he'll sit in the car." Officer A stated if he sits in the car then you go to "Plan B." That is, Officer A stated that there was a chance the driver would not leave the car, in which case Officer A and VAUGHAN would approach and detain the driver and steal the marijuana from his car as previously planned.

59.     CS1, Officer A, and VAUGHAN discussed the amount of proceeds they would receive from selling the marijuana. CS1 stated, "I'm thinking, in an ideal world 300 large." In other words, CS1 expected to receive $300,000 from the sale. Officer A stated, "I would have to say probably maybe more like…..250 to 275 … because he's been dumping it . . . for 2700 dollars

24

to 2500 dollars." That is, Officer A expected to receive between $250,000 and $275,000 because the price for the sale or marijuana, according to Officer A, was approximately $2,500 to $2,700 per pound. CS1 asked how much they should give Individual A. Officer A stated, "Let's do the 25, so divided by four, that's 6,60 a piece . . . with change, 63 a piece." CS1 stated, "Sixty-two five". That is, CS1 stated they would each receive $62,500. VAUGHAN stated, "Sixty-two five." VAUGHAN stated, "Throw him [Individual A] fifty thousand and you take the rest." CS1 asked VAUGHAN what he thought about the plan to split the funds. VAUGHAN stated, "Its fine with me, I don't even know the guy, I don't give a shit what you give him."

60. CS1 asked if VAUGHAN had talked to another narcotics dealer, not Individual B, that he would consider using to sell their stolen marijuana. VAUGHAN stated, "Before, you know, I kept calling him giving him the heads up and then nothing would go...if we get it and I end up calling him, he's right on the money." That is, VAUGHAN stated he would contact this dealer when they had possession of the marijuana. CS1 stated he hoped the marijuana didn't go "bad." Officer A stated, "I can't see it being more than a couple of months," referring to how long it would take to sell. Referring to a previous marijuana robbery, CS1 stated, "We've had it with those guys before for a long time...Melrose took us how long to get paid out, wasn't it like six months?" VAUGHAN stated, "Oh, yeah."

61. Regarding communicating with each other, CS1 stated he didn't like carrying two phones, so if Officer A and VAUGHAN needed to get a hold of him, he requested that they send him a text. CS1 would then call from the "burner" phone. Officer A suggested that they use the code word, "Turn on that station, they're playing our music," as a signal to use the "burner" phones to communicate with each other.

62. Referring to the contraband cigarette transaction on July 30, 2013, CS1 stated, "The

25

only other thing to be careful about, like I said, that last one on Devon [Individual E's store], I did say on there 'Bobby grabbed a gun.'" That is, CS1 referred to the fact that he said on a recording that VAUGHAN had stolen a gun from Individual E's store. VAUGHAN stated, "I never heard that." CS1 responded, "It was on the DVD."

63.    After the meeting, CS1 placed a consensually recorded call to Officer A. Officer A told CS1 he would stop by CS1's house before he went home. CS1 then consensually recorded that meeting with Officer A. During the recorded meeting, CS1 asked Officer A what VAUGHAN had said after CS1 left their meeting. Officer A stated, "He was just nervous about that because…he thinks you're asking questions by going back [to prior robberies]… because you're recording us." CS1 stated the next time they should just get "naked," so that he could prove he was not wearing a wire. Officer A stated he told VAUGHAN, "If [CS1] wanted to fucking do us, you know, do us up or something…. he wouldn't wait to the fucking weed of the hour." In other words, Officer A stated that CS1 would not be cooperating with law enforcement so close to his report date to the Bureau of Prisons to serve his sentence. Officer A stated he told VAUGHAN not to worry, and further stated to VAUGHAN, "[CS1] is not doing you up."

64.    CS1 and Officer A further discussed the planned marijuana robbery and the chances of getting caught. Officer A stated, "I'm talking about [Individual A] breaking down and saying you got two dirty cops[.]" Officer A stated if anybody asked him questions about the planned marijuana robbery, he would say, "Get the fuck out of here, I don't know what you're talking about."

### October 27, 2014 Consensual Recording with Officer A

65.    On or about October 27, 2014, CS1 consensually recorded a telephone conversation with Officer A. CS1 said that the plan for the robbery was still in effect and that the

vehicle with the marijuana would be in Chicago on November 3, 2014. Officer A stated, "You think the 3ʳᵈ might be the D day?" CS1 said, "Yes."

### October 28, 2014 Consensual Recording with Officer A and VAUGHAN

66.     On October 28, 2014, CS1 consensually recorded a meeting with Officer A and VAUGHAN. This meeting was recorded with audio only. Referring to the latest information he received from Individual A regarding the planned robbery, CS1 stated, "He's (Individual A) on board, he's going to go there, get the car in his name, we should have the description, everything, plate probably to." Officer A responded, "Yeah, we're gonna need the [license] plate."

67.     VAUGHAN stated, "Ask him (Individual A) if it's going to be just some fucking schmuck driver." CS1 responded, "I will." CS1 stated, "Maybe he'll go down [to Texas] and get a surprise...Individual A will know more about the guy and it's somebody that has a warrant." Officer A responded, "Yeah yeah." VAUGHAN responded, "that would be awesome...we're not going to charge you with this fucking weed but you got a warrant." In other words, VAUGHAN was formulating an excuse not to charge the driver for the possession of the marijuana without raising suspicion, because the driver may have a pending warrant on another matter that would justify his arrest. Officer A stated, "I didn't think about it, if the guy was wanted there would be no questions asked." That is, Officer A expressed a means by which they could arrest the driver without disclosing that he was in possession of the marijuana.

68.     Further discussing the planned robbery, Officer A stated, "I think just...bring him in...put one pound in evidence so there's something there." Officer A suggested they tell the driver, "The State's Attorney doesn't want to charge you, because the car is in someone else's name, we're gonna talk to that guy [the renter of the car], you're free to go."

69.     Referring to the planned robbery, CS1 stated, "Hopefully this goes through, we're

27

done.... Hopefully I get a thirty day extension." That is, CS1 expressed his hope that his report date to the Federal Bureau of Prisons to serve his sentence would be extended. Referring to the possible extension, Officer A stated, "It would be nice if you got that because...then you could see some of the money come through."

### *November 3, 2014 Robbery of UC*

70.     On November 2, 2014, CS1 consensually recorded his telephone call with Officer A. During that recorded conversation, CS1 provided the approximate time when the driver from Texas, with the car containing the marijuana, was expected to meet with Individual A the next day, November 3, 2014. In addition, CS1 provided Officer A the general location for the meeting, a description of the car, and the car's license plate number.

71.     During the morning of November 3, 2014, according to CS1, CS1 provided Officer A and VAUGHAN again with the approximate meeting time and location where the driver from Texas was expected to meet with Individual A. According to CS1, he told Officer A and VAUGHAN that the driver, with the car containing the marijuana, would be parked at a certain location in Bedford Park, Illinois.[10]

72.     On November 3, 2014, at approximately 1:00 p.m., an undercover FBI agent (UC) was present in a rental car that was parked at the agreed location in Bedford Park and that contained approximately seventy pounds of marijuana in two duffle bags in the trunk of the car. The rental car had Texas license plates and had paperwork in the car that stated it had been rented in Texas under the name of Individual A. At the direction of the FBI, the UC was to represent to Officer A and VAUGHAN that he was the driver of the Texas car.

73.     At approximately 1:15 p.m., FBI agents conducting surveillance observed Officer

---

10      The Village of Bedford Park is located within the Northern District of Illinois.

A and VAUGHAN approach the UC's car in their Cook County Sheriff's Office vehicle. FBI agents observed that the vehicle had its police lights flashing. FBI agents saw Officer A and VAUGHAN get out of their cars and walk up to the UC's car. FBI agents observed that Officer A was wearing a jacket with the words "Sheriff's Police" and VAUGHAN was wearing a vest with the word "Police" on it. FBI agents observed police badges on Officer A's and VAUGHAN's vests. FBI agents also saw that Officer A and VAUGHAN had their weapons holstered on their belts. FBI agents saw Officer A and VAUGHAN question the UC. FBI agents also saw VAUGHAN walk around the vehicle and inspect it. FBI agents saw the UC get out of his vehicle, and Officer A handcuff the UC. FBI agents also saw Officer A transfer the two duffle bags containing approximately seventy pounds of marijuana into their police vehicle, while VAUGHAN stood with the UC. Shortly thereafter, FBI agents executed an arrest of both Officer A and VAUGHAN. Both defendants were taken to a detention facility in Chicago. According to personnel at the detention facility, Officer A died early this morning.

29

## CONCLUSION

74.     Based on the information in this affidavit, there is probable cause to believe that, between at least in or about January 2011 and in or about November 2014, at Chicago, and elsewhere, in the Northern District of Illinois, Eastern Division, ROBERT VAUGHAN did knowingly conspire to commit robbery by obtaining property, namely marijuana, contraband cigarettes and money, and thereby affected commerce, in violation of Title 18, United States Code, Section 1951.

JEFFREY B. MOORE
Special    Agent,    Federal    Bureau    of
Investigation

SUBSCRIBED AND SWORN to before me on _Nov 4th_, 2014

HONORABLE DANIEL G. MARTIN
United States Magistrate Judge

30